27 C.C.P.A.(Patents)

### CHAMBERLAIN v. KLEIST.
#### Patent Appeal No. 4325.

Court of Customs and Patent Appeals.
June 24, 1940.

Frank E. Liverance, Jr., of Grand Rapids, Mich., for appellant.

Donald M. Carter, of Chicago, Ill., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

This is an appeal in an interference proceeding wherein the Board of Appeals of the United States Patent Office affirmed a decision of the Examiner of Interferences awarding to appellee priority of the invention defined in the counts of the interference, seventeen in number.

The interference arises between a patent issued to appellant on August 25, 1936, No. 2,052,014, upon an application filed August 17, 1935, and an application of appellee filed January 2, 1936, Serial No. 57,178.

Appellee copied the claims corresponding to the counts from appellant's patent for purposes of interference.

Appellee being the junior party, the burden was upon him to establish priority of invention by a preponderance of evidence. As appellee's application was copending when appellant's patent was issued, appellant derived no advantage from the issue of his patent.

The general subject matter of the issue is described in the decision of the Board of Appeals as follows:

"The subject matter of the issue relates to a heat exchange structure that may be adapted for storing either heat or the reverse, that is, storing cold, the latter used as a noun in this art. The device is emphasized in this record as being particularly adapted for the latter, that is, a receptacle-like member contains a quantity of suitable eutectic composition consisting mainly of water which may be congealed into an ice-like mass and then the device employed like a block of ice. The counts are directed to the refrigerating unit and to a kind of process of producing the same.

\* \* \* \* \* \*

"More specifically the closed metallic unit comprises a casing which may be of relatively flat configuration formed of sheet

metal and with a tubing extending in zigzag relation through the inside of the casing. The tubes are of such thickness as to substantially contact with the side walls of the casing. The unit is substantially filled, say to 90%, with the liquid eutectic mixture which is a mixture of water with glycerine or suitable salt to lower its freezing temperature. The 10% of free space in the receptacle is then exhausted of atmosphere leaving substantial vacuum except for the presence of the water vapor which is 4.5 mm. of mercury at 0° C. Because of at least a partial vacuum in the interior of the receptacle, atmospheric pressure from and on the outside serves to hold the sheet metal side walls in good heat conducting relation with the tubing inside. Chilled brine is circulated through the tubing to freeze the eutectic at the predetermined adjusted temperature selected, say 18° F. The unit may then be used like a block of ice to cool articles or refrigerating space."

Appellant's patent has been assigned to the Kold-Hold Mfg. Company, and the application of appellee to the Dole Refrigerating Machine Company. These companies will be hereinafter referred to as the Kold-Hold Company and the Dole Company, respectively.

Counts 5, 6, 10, 12, and 17 are illustrative, and read as follows:

"5. A refrigerating unit comprising a metal container having opposed flat sides, a refrigerating coil located within said container, the pipes of said coil extending between opposite sides of the container, said container having a cryohydrate therein which has an appreciable vapor pressure under the temperatures at which the refrigerating unit is used, said container and the cryohydrate therein being at a less pressure than the pressure of surrounding atmosphere whereby atmospheric pressure forces the side of the container inwardly toward the pipes or tubes of said coil, substantially as and for the purposes described.

"6. The herein described method, consisting of providing an enclosing container having opposed sides and with a coil located within said container between said opposed sides and substantially bridging across between said sides, filling said container partly with a liquid having an appreciable vapor pressure under the temperature conditions at which used, and removing air from the container to reduce the pressure therein below atmospheric pressure, as specified.

"10. The process of producing a wringing film which consists in bringing two surfaces, having liquid films thereon, together under pressure.

"12. The method of producing and maintaining thin films of high thermal conductivity between two members not in actual contact by the utilization of pressure.

"17. A unit of the class described comprising a container having a heat carrying medium therein and a second container having a cryohydrate or the like therein, portions of said containers being in forcible contact, said portions being separated by a 'wringing' film for the purpose described."

The essential element of the invention here involved is the exhaustion of air from the container partly filled with a liquid having an appreciable vapor pressure, so that the pressure within the container is less than the atmospheric pressure on the outside thereof, whereby the sides of the container are forced by the atmospheric pressure inwardly against the coil inside of the container, and films formed upon the surfaces of the container and pipes are compressed forming an intimate heat transfer bond between the container and the pipes of the coil.

It will be observed that count 10 embraces "The process of producing a *wringing film* which consists in bringing two surfaces, having liquid films thereon, together under pressure." (Italics ours.) Other counts also contain the element of the "wringing film." The question of what constitutes a "wringing film" will be hereinafter discussed.

Appellant, who is a professor of physics at Michigan State College, in his preliminary statement alleged conception of the invention defined in each of the counts on or about March 12, 1926, and that he disclosed the same to others "on or about the 1st day of April, 1926;" that the invention defined in certain of the counts was reduced to practice by him on or about the 15th day of April, 1926, and that as to the other counts the invention was reduced to practice by him on or about the 15th day of March, 1931.

Appellee in his preliminary statement alleged that he conceived and disclosed to others the invention defined in the counts on or about January 2, 1934, and reduced it to practice on or about February 1, 1934.

Both parties took testimony.

The Examiner of Interferences held that appellee had established conception of the invention "at least as early as February of 1934," and that he had reduced it to practice "at least as early as March 1, 1934." He further held that appellee was the first to conceive the invention and that appellant first reduced it to practice in February of 1935. The Examiner of Interferences also held that appellant first learned of the invention from appellee and his assignee, and therefore was not an original inventor of the subject matter of the counts. This latter holding was based upon a finding by the Examiner of Interferences that appellee and his assignee had disclosed the invention to appellant and his assignee "at least as early as November of 1934." Therefore, the effect of the decision of the examiner was that appellant had no conception of the invention prior to its disclosure to him by appellee as early as November 1934.

The Board of Appeals affirmed these findings of the Examiner of Interferences and in its decision stated: "We have carefully reviewed all of Chamberlain's record in connection with the several exhibits and model (Exhibit 8) introduced in connection therewith without finding proof even of conception before Kleist established reduction to practice in February, 1934. * * "

Upon the question of originality of the invention the board in its decision stated: "Finally we conclude that there was such communication and disclosure by Kleist to Chamberlain, Farnsworth and others of the Kold-Hold Company together with collateral features as to establish the fact that Kleist was the first inventor and that Chamberlain derived the invention from Kleist. In December, 1934, after Kleist's invention had been tested out and accessible for possible public inspection, Farnsworth, the general manager of the Kold-Hold Company, requested by letter (Kleist's Exhibit 38), that it would be desirable for Dr. Chamberlain to observe a test of Kleist's mechanism, that is, the vacuum plates. Kleist testifies that a meeting was held and that the invention was fully disclosed and explained to Chamberlain. It is testified that Chamberlain made no suggestion that the invention was his nor does Chamberlain deny such disclosure and it is a matter of record that Chamberlain's application was not filed until later. We are of the opinion that the showing is sufficient to satisfy the requirements for a determination of this case upon the ground of originality. We

hold that Chamberlain derived the invention from Kleist."

In appellant's reasons of appeal no error is assigned with respect to the findings of both Patent Office tribunals that appellant had no conception of the invention prior to November, 1934, and that his first reduction to practice was in February, 1935, nor are these findings challenged in appellant's brief before us. Moreover, there is no error assigned in appellant's reasons of appeal in the holding of the Patent Office tribunals that appellant derived the invention from appellee, except inferentially as hereinafter set forth.

Therefore, in approaching the consideration of the case we must regard it as established that appellant is not entitled to any date of conception of the invention prior to November, 1934, and that his first reduction to practice occurred in February, 1935.

Appellant's reasons of appeal are nine in number. Nos. 1 and 4 relate to appellee's reduction to practice. Nos. 2, 3, 5, and 6 allege a misunderstanding by the Board of Appeals of the invention involved. No. 7 alleges error by the Board of Appeals in not construing the invention in the light of appellant's patent. No. 8 alleges that the board erred in failing to give due weight to a certain disclosure in appellee's application, and No. 9 alleges that the board erred in holding that appellee's "vague statement of utilizing vacuum, guessed at as between 5 and 10" of mercury, satisfied the issue and produced the invention.

█ There having been no motion by appellant to dissolve the interference upon the ground of lack of disclosure in appellee's application to support the counts, we must accept as an established fact that both appellant's patent and appellee's application disclose the invention defined in the counts.

However, if it be a fact that the method and structure relied upon by appellee for conception and reduction to practice of the invention do not support the counts, then it may fairly be inferred that no question of originality could arise, for appellee does not claim to have disclosed to appellant any invention other than that involved in such method and structure.

It is appellant's contention that appellee's method and structure relied upon for conception and reduction to practice do not support the counts because it was not shown that sufficient air was exhausted from the container to "coalesce the surface films" as prescribed in some of the counts, or "pro-

duce a 'wringing film'," as described in certain other counts, and that the proof does not show that appellee had conceived the invention prior to appellant's filing date, August 17, 1935.

A considerable portion of appellant's brief is devoted to the question of the patentability of the issue. In appellant's brief it is stated: "Courts in the treatment of patent claims, and because of the relation of such courts to the public interest, have a duty to perform—see that the claims are construed to cover no more than what advance has been made over the prior art. In general it is the function of the Patent Office to carefully scrutinize the claims and see that claims are not allowed to cover more than the invention which has been made over prior practices. But frequently claims couched in broad language are issued and come to the courts for consideration, whereupon it is a duty of the court to either hold the claims invalid if there is no invention, or to construe the claims to what invention or advance has been made. Where the matter has passed beyond the power of the Patent Office to correct the claims if they have been too broad, in an interference between two parties seeking the claims which appear in an issued patent, it is the duty of the court as the Supreme Court has said, to determine whether or not a patent will be issued to the applicant who is asking for it."

 Counsel for appellant must have been aware of the many decisions of this court holding that, in an interference proceeding, the patentability of the issue will not be considered by us.

In the case of Marshall et al. v. Ledwinka, 67 F.2d 495, 496, 21 C.C.P.A., Patents, 728, we said:

"That in an interference proceeding the counts must be given the broadest interpretation which they will reasonably support is so well established that citations of authority are unnecessary.

"While appellants, of course, recognize this rule, they contend that there is another rule which must also be considered, viz., that the count should not be so interpreted as to render it unpatentable if a narrower construction may properly be given it that will avoid anticipation by prior art patents.

"It is apparent, however, that the Board of Appeals in the case at bar did give the count here involved a broad interpretation, and we are not at liberty in this proceeding to inquire whether such broad interpreta-

tion renders the count unpatentable. McCabe v. Cramblet, 65 F.(2d) 459, 20 C.C.P. A. [Patents] 1220; Deibel v. Heise & Schumacher, 46 F.(2d) 570, 18 C.C.P.A. [Patents] 907; Brogden v. Slater, 40 F.(2d) 988, 17 C.C.P.A. [Patents] 1240.

"We said in the case last cited that, had the Board of Appeals narrowly construed the claims and held that if broadly construed they would not be patentable, a different question would be presented. A like observation is applicable here. So far as this case is concerned, the count as construed by the Board must be regarded as patentable, and therefore there is no occasion here for the application of the rule contended for by appellants, that the count must be given a narrower construction than that given it by the board to avoid anticipation by the prior art.

"Whether the count, as construed by the Board, is in fact patentable is a matter for ex parte consideration by the Patent Office tribunals, and cannot be inquired into upon this appeal. Gowen v. Hendry et al., 37 F.2d 426, 17 C.C.P.A. [Patents] 789; Brogden v. Slater, supra."

In the case at bar the counts were construed broadly by the Patent Office tribunals in accordance with the general rule and each of the counts corresponds to a claim in appellant's patent. The claims were framed by him voluntarily, and if any of his claims are in fact unpatentable, construed broadly, he is hardly in a position to claim that they are unpatentable for they were framed in language of his choice.

In the case of Writer v. Kiwad, 63 F.2d 259, 262, 20 C.C.P.A., Patents, 869, we said: " * * * in interference cases, if the counts are not ambiguous, they should be given the broadest interpretation which they will reasonably support, and a party who deliberately elects to claim his invention broadly is not in a position to insist that limitations be read into them for the purpose of avoiding the issue of priority. * * *"

See, also, the case of Dawson v. Martin, 111 F.2d 300, 27 C.C.P.A., Patents, ——.

It appears from the record that on September 22, 1931, patent No. 1,824,158 was issued to appellee as assignor to the Dole Company, which patent disclosed and claimed a refrigerating apparatus comprising a coil between sheets of steel, welded and sealed, and having the air exhausted. Said coil was adapted to contain a refrigerant. There was no liquid or other sub-

stance between the coil and the walls of the container.

The invention here involved distinguishes from said patent in that it comprises the element of a liquid having a vapor pressure surrounding the coils within the walls of the container, and exhausting air from the remaining air space in the container, thus decreasing the pressure within the enclosure below that of atmospheric pressure, whereby the walls of the container are pressed inwardly to the extent stated in the various counts.

It appears that for some time prior to 1934 the Dole Company manufactured and sold apparatus embodying the invention claimed in said patent, terming the same "Dole Vacuum Plate."

It further appears that early in 1934 appellee conceived the idea that, instead of providing a complete vacuum in the container, a glycerin solution be placed therein and the air thereafter exhausted from the container, causing the atmospheric pressure upon the outside of the container to press the sides of the container against the pipes of the coil. This device was denominated by the Dole Company as "hold over vacuum plates." Appellee testified that in the exhaustion of the air conceived by him there was never any definite vacuum, but that there was a partial vacuum. He further testified upon cross-examination as follows:

"XQ. 21. When you began to use a solution in a plate of the kind which you started to make in 1929 and after the plate was partly filled to what degree did you exhaust the air from the remaining space in the jacket or plate? A. Well there was never any definite vacuum, a partial vacuum.

"XQ. 22. You don't know whether it would be measured by 2 inches of mercury, 20 inches or 26 inches? A. Well, possibly five to ten inches of mercury, which means air exhausted out of the container would cause the atmospheric pressure to press the sides of the container against the coil. In our exhausting the air over certain point this would not make any difference.

"XQ. 23. You don't know what the air pressure per square inch against the outer sides of the jacket was, do you? A. Not definitely."

The question involved upon this branch of the case is whether the method and structure conceived by appellee, as above set forth, support the counts here involved. It is appellant's contention that appellee neither conceived nor disclosed nor reduced to practice a method of producing a "wringing film" as prescribed by some of the counts, or "coalescing" the surface films as prescribed in some of the other counts, or similar limitations found in other counts. As to counts 5, 6, and 9, which do not contain such limitations, appellant contends in effect that they must be construed as containing such limitations, for otherwise, appellant contends, they are void.

This last contention, for reasons hereinbefore stated, cannot be considered by us. Appellee in his application does not use the term "wringing film," nor does he state that his process results in coalescing the surface films between the metallic members. He testified that he did not understand the term "wringing film."

Upon this point the Examiner of Interferences, after describing the structure and method conceived by appellant, stated: "That these units were identical with the structure disclosed both in the Chamberlain patent and in the Kleist application there can be no doubt. Chamberlain argues, however, that there is no proof that said units include a 'wringing film', and that therefore no reduction to practice has been established by Kleist. This position is not well taken. In the first place, according to the theory set forth in the Chamberlain record, surface films are inherently present in a structure of the type disclosed by the parties, and 'wringing films' are merely the result of pressing two surface films together. It appears moreover that these films (whether surface or 'wringing'), are extremely thin, being somewhere in the order of a ten-millionth of an inch in thickness. Manifestly the imperfections and irregularities in ordinary construction materials, such as the sheets and tubes used in either the Dole or Kold-Hold units, so far exceed this infinitesimal film that it is substantially impossible as a practical matter to bring any appreciable areas into such close proximity. Under these circumstances the presence or absence of a 'wringing film' in the academic sense would appear to be more or less a matter of metaphysical discussion. Certainly there is no exposition in the Chamberlain record of any method capable of giving satisfactory and convincing proof on this point."

It is appellant's contention that for the meaning of the terms used in the counts resort should be had to his patent here in interference. We think that under the cir-

cumstances said patent should be considered to determine whether it supports the contentions of appellant here made. We quote therefrom as follows:

"When the unit is used for refrigeration purposes a refrigerating fluid is circulated through the coils 1. The interior of the containing unit is partly filled with a suitable eutectic solution, a liquid having an appreciable vapor pressure at the temperatures of the containing unit and of the cryohydrate contained therein. The unit is preferably nearly filled with the cryohydrate eutectic solution but leaving some air. The air is then exhausted to a desired degree so that the pressure within the unit is less than atmospheric pressure outside whereby when the unit is sealed in such condition the pressure of the atmosphere at the outside causes the sides 2 to be pressed snugly against the adjacent portions of the coils 1, and such coils against plate 3.

\* \* \* \* \* \*

"This condensed vapor surface film is indicated at 8 in Fig. 5 in highly magnified form. It is not a film which is visible to the unaided eye nor can it be seen with the highest power microscope. I have provided an optical instrument of my own construction for the observation and determination and characteristics and properties of the film, and have found it to be six ten millionths of an inch thick, or not over five molecules thick. This film is very hard and when two of the films on two surfaces are brought together, as illustrated in Fig. 5, the two films under pressure partially coalesce, as indicated at 9, and form what is called the 'wringing film'. This wringing film 9 cannot be reduced in thickness under additional pressure no matter of what degree. Such films are very hard, having high compression strength and because of their extreme thinness and other physical characteristics possess a much higher coefficient of heat conductivity than the free liquid of which they are composed. Thus there is provided between the metal tubes of the refrigerating coils 1 and the metal members 2 and 3 of the refrigerating unit a direct thermal contact which in every way is one having capabilities of heat conduction approaching if not actually equaling the heat conduction of integral metal construction.

"It will therefore be understood that by exhausting any amount of air from the sealed unit the excess pressure of the atmosphere at the outside produces the necessary pressure to cause the surface film 8 on the contacting surfaces to be pressed together and coalesce as at 9 to make the wringing films described, and produce the intimate thermal relation which has been described as following therefrom.

\* \* \* \* \* \*

"The thermal bond between the tubes and the fins provided by the plates 2 and 3 possesses very high conductivity as long as the excess of external pressure over internal pressure causes the plates 2 to be forced inwardly *against* the tubes, and consequently said tubes or pipes forced inwardly *against* the intermediate plate 3, thus producing and maintaining the wringing films 9 from the always present surface films 8." (Italics ours.)

■ It clearly appears from the above quotations that appellant did not contemplate complete exhaustion of air from the container, nor any particular degree of exhaustion, and if the process taught by appellant would produce a "wringing film," so would the process conceived by appellee prior to November, 1934.

Being in full agreement with the concurring decisions of the Patent Office tribunals that the method and structure conceived by appellant as hereinbefore set out support the counts here involved, and that appellee was the first to conceive the invention, we will next discuss the holding of said tribunals that appellant derived the invention from appellee.

■ If the record sustains this holding, then the question of appellee's reduction to practice becomes immaterial upon the issue of priority.

It appears that appellant's assignee, the Kold-Hold Company, prior to its use of the invention here involved, manufactured a cooling unit comprising an enclosed metal tank in which an evaporator coil was submerged in an aqueous solution freezing at a predetermined temperature. In assembling the parts no air was exhausted from the tank, but the tank, after being filled with solution to approximately ninety percent of the interior volume, was sealed, the resulting air space serving to allow for expansion during the freezing of the solution; that early in 1934 a unit comprising appellee's invention was sold by the Dole Company for equipment built for the Kroger Grocery Company, and was put into actual operation on or about February 23, 1934, in the display window of said company's store in St. Louis, Mo. As hereinbefore stated,

852

units of this type were denominated by the Dole Company as "Dole vacuum holdover plates," as distinguished from the "Dole vacuum plates" having no solution in the container.

The evidence establishes that one Wm. J. Edmunds, a field engineer in the employ of the Kold-Hold Company, visited the plant of the Dole Company in the latter part of September, 1934, for the purpose of making certain tests of a unit being produced by the Dole Company, the particular purpose of such tests being to determine whether a eutectic solution then being produced by the Kold-Hold Company could be successfully used in said unit. Edmunds on December 26, 1934, made a report of such tests to the Kold-Hold Company, the report indicating that a copy thereof should be sent to appellee. We quote from said report as follows:

"The general descriptive construction of the Dole plate embodies an evaporator, steel or copper, ranging in sizes, 3/8, 1/2, 5/8, 3/4, 3/16, 1" and other special forms such as oval.

"The approximate length of the evaporator is two lineal feet of evaporator per sq. ft. of refrigerated surface or four lineal feet per sq. ft. of plate surface.

"The evaporator is then enclosed in a steel container of inside dimensions to fit the tubing snug; that is, if 5/8" tubing is used the inside dimensions of the tank will be 5/8" by the length and width as required. The container is then acetylene welded and evaporator outlets either brazed or welded to the container. The outlets when steel tubing is used consist of steel pipe 1/8" walls which is welded to steel tubing inside the container where the evaporator outlet ends are cut from 1 to 2" shorter than the evaporator length.

"The plates are tested for leaks by means of ammonia, 30# per sq. inch. They are then galvanized outside and in many cases where not objectionable, inside.

"They then *evacuate* the plates and seal same by means of a pipe plug or other suitable means. The *vacuum* causes the container shell to collapse against the evaporator giving the desired fin contact between the container wall surface and the evaporator. This insures an even and rapid pulldown.

"Dole has sold many of these plates which have proven *their* theory correct." (Italics ours.)

"Dole Plate Using a Hold-Over Solution.

"Kold-Hold No. 4 and No. 6 solution was used in different size and shaped plates and proved very adaptable, with possibly a large demand for all types of refrigeration.

"Tests were made on an ice cream cabinet using two Dole plates mounted against the side walls and filled properly with No. 4 Kold-Hold solution. The results of the test were very gratifying even under the adverse conditions in which tests were made.

"There was also test made with Dole plates in a vertical and horizontal position filled with No. 4 and No. 6 solutions. These tests were mainly to determine the effect from expansion of the solution with same under vacuum. With the air evacuated from the space allowed for normal expansion during the freezing of the solution, and same allowed to operate on a partial melt and complete solidifying cycle some 150 times, no noticeable effect as to the destruction of metals or inefficiency was observed.

"Under identical conditions except with solution under normal atmospheric pressures such as is the case with Kold-Hold plates, there was a fracture of the container as reported in my report of December 7, 1934. The reason for this fracture is covered in Mr. McGuffey's report to me of December 10, 1934.

"The fracture was repaired and placed under test with air evacuated and after approximately 50 partial melts and solidifications, results were the same as noticed under original test under same conditions."

This report clearly establishes that the involved invention was disclosed to appellant's assignee by appellee's assignee as early as December, 1934.

It is further established that at the request of the Kold-Hold Company appellant had a conference with appellee in December, 1934. Appellee testified with respect to this conference as follows:

" * * * I met Dr. Chamberlain in Mr. Farnsworth's office in Olds Tower Building, Lansing, Michigan and our discussion turned toward the vacuum plate and I went into all detail of the construction, applications and the great many uses this plate could be put to. I explained to him the way that we manufactured it, that is the tubing, steel that was used, the tubing was copper and the jacket was steel, and the way the vacuum was drawn. I also explained to him how we put the solution in there and then drew a vacuum by exhausting the air in

the container thereby decreasing the pressure, causing the sides of the plate to press against the coils by the pressure of the atmosphere. Dr. Chamberlain then mentioned the fact that if we had liquid in the plate and drew a vacuum, the liquid would all be forced out of the container. I mentioned to him that we allowed approximately ten to twelve per cent space so that when the air was exhausted, the liquid would absolutely remain in the container. I told him that we had a great number of these plates out in service and there was never any question about that point and about the great efficiency that our vacuum holdover plate had over ordinary brine tanks, the ordinary brine tanks being constructed out of heavy gauge metal which retained the air. * *

"Q. 97. Did Clark W. Chamberlain at the interview you had with him in December 1934 make any claim to the invention involved in this interference? That is, to the vacuum holdover construction which you at that time explained to him. A. He did not."

The Mr. Farnsworth referred to in said testimony was the vice president of the Kold-Hold Company.

This testimony was taken in July, 1937. Thereafter, in October, 1937, the testimony of appellant was taken. In his testimony there is no rebuttal of appellee's testimony respecting his disclosure to appellant as hereinbefore set forth. Furthermore, in appellant's brief it is not denied that appellee's disclosure as testified to by him was made to appellant. It is merely contended that said disclosure, if made, did not describe the involved invention.

In this connection it is interesting to note that appellee's commercial embodiment of the invention was regarded by appellant's attorneys, in October, 1936, as an infringement of appellant's patent, for there is a letter in the record from such attorneys to the Dole Company charging such infringement and notifying it that they had been instructed to institute proceedings against the Dole Company for infringement of appellant's patent.

Regarding the activities of appellant's assignee, the Kold-Hold Company, with respect to the involved invention, the Examiner of Interferences in his decision stated:

"Throughout 1933 and 1934 it is certain that the Kold-Hold organization continued to work with the unit containing holdover solution at atmospheric pressure. While there is some vague mention of experiments relating to evacuated units during this period, no contemporaneous documentary or physical exhibits have been produced.

"Beginning in January or February of 1935, however, there was considerable activity by Kold-Hold. An extensive series of tests were run in which the superiority of evacuated holdover units was demonstrated; the company changed the design of Kold-Hold units in many significant respects, and began commercial production of the new unit; and the application for the involved Chamberlain patent was prepared and filed."

We deem further discussion unnecessary for we have no doubt from the record before us that appellant and his assignee derived the involved invention from appellee, and therefore the decision of the Board of Appeals is affirmed.

Affirmed.